IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| IN RE NATURE'S SUNSHINE PRODUCT'S INC. SECURITIES LITIGATION | MEMORANDUM DECISION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL<br><br><br>Case No. 2:06-CV-267 TS |

I.  INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel.  Plaintiffs seek certification of the following classes:

•       all persons who purchased or otherwise acquired the common stock of Nature from

        March 16, 2005 through April 5, 2006 and were damaged thereby, pertaining to the

alleged violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 thereunder;

•  all persons who purchased or otherwise acquired the common stock of Nature from March 15, 2005 through April 5, 2006 and were damaged thereby, pertaining to the alleged violations of Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

•  Excluded from both Classes should be defendants, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director, or other individual entity in which any defendant has a controlling interest or that is related to or affiliated with any of the defendants, and the legal representative, agents, affiliates heirs, successors-in-interest or assigns of any excluded party.

Lead Plaintiff Loh Chee Kuang and named Plaintiffs Rick Kader and Peter Rathmann also seek appointment as class representatives.  Finally, Plaintiffs seek the appointment of the Rosen Law Firm, P.A. as lead counsel for the Class, and Hatch, James & Dodge as liaison counsel for the Class.

The Court heard oral argument on the Motion on April 10, 2008.  For the reasons set out below, the Court will grant the Motion in part.

## II.  DISCUSSION

A.    RULE 23(a) REQUIREMENTS

A class may be certified only if all four of the following prerequisites are met: (1) numerosity: the class is so numerous that joinder of all members is impracticable; (2) commonality: there are questions of law or fact common to the class; (3) typicality: the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4)

2

adequacy of representation: the representative parties will fairly and adequately represent the interest of the class.[1]  "A party seeking class certification must show 'under a strict burden of proof' that all four requirements are clearly met."[2]

The parties do not dispute that Plaintiffs have meet the first three requirements—numerosity, commonality, and typicality—thus, the Court finds that Plaintiffs have met their burden as to the first three prerequisites.  Defendants argue, however, that Plaintiffs have failed to meet the fourth prerequisite—adequacy of representation.

"Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"[3]

Defendants do not assert that there are any conflicts between the proposed class representatives or their counsel and other possible class members.  Nor do Defendants assert that Plaintiffs' counsel are unqualified, inexperienced, or unable to vigorously conduct this litigation.  Rather, Defendants argue that Plaintiffs' counsel, not Plaintiffs themselves, are controlling this litigation.  Additionally, Defendants point to a number of other factors which they argue make Plaintiffs inadequate class representatives.

---

[1]Fed.R.Civ.P. 23(a).

[2]*Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

[3]*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (quotation marks and citation omitted).

     *1.    Plaintiffs' Knowledge*

Defendants point to the Fifth Circuit decision of *Unger v. Amedisys, Inc.*,[4] to support their proposition that Plaintiffs are inadequate.  The court in *Unger* stated that, in order to meet the requirements of Rule 23(a)(4), "[c]lass representatives must satisfy the court that they, and not counsel are directing the litigation."[5]  In order to do this, "class representatives must show themselves sufficiently informed about the litigation to manage the litigation effort."[6]

Courts have recognized that "[i]n a complex lawsuit . . . the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative."[7]  "Only if the class representatives' 'participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case' should they fail to meet the adequacy of representation requirement."[8]

The Court finds that the class representatives are sufficiently informed to manage the litigation effort and have not improperly abdicated the conduct of the case to their attorneys.  In their Declarations, Plaintiffs Loh, Kader, and Rathmann affirmatively state, among other things, that they: have read the initial complaint and have reviewed and authorized the filing of the

---

[4]401 F.3d 316 (5th Cir. 2005).

[5]*Id*. at 321.

[6]*Id*.

[7]*Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (quotation marks omitted).

[8]*Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 296 (E.D. Va. 2004) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir. 1987)).

Consolidated Class Action Complaint;[9] are aware of the allegations contained in the Consolidated Class Action Complaint;[10] are aware of the nature of a class action lawsuit;[11] are aware of the class periods involved in this litigation, which were limited by the Court;[12] understand that this litigation is in the discovery phase and have communicated with counsel concerning discovery;[13] are aware of their role as a class representative and are willing to undertake that role;[14] will continue to communicate with counsel about the status of litigation, case strategies, settlement negotiations, and other matters pertinent to overseeing the litigation;[15] and have continued to monitor news about Nature during the course of this litigation and will continue to independently monitor developments.[16]

These statements are supported by the statements made by Plaintiffs in their depositions. In his deposition,[17] Plaintiff Loh states that: he had a lot of communication with his counsel

---

[9]Docket No. 117, Exhibit 1, ¶ 3. Exhibit 1 contains declarations from all three individuals. The declarations are largely the same. Citation to paragraphs contained in the declarations apply to each declaration.

[10]*Id.* ¶¶ 5–7.

[11]*Id.* ¶ 8.

[12]*Id.* ¶¶ 9–10.

[13]*Id.* ¶¶ 11–12.

[14]*Id.* ¶¶ 13, 15, 19.

[15]*Id.* ¶¶ 16, 18.

[16]*Id.* ¶ 17.

[17]Docket No. 127, Exhibit B.

concerning the preparation of the complaint;[18] he reviewed a draft of the complaint;[19] and he reviewed a draft of the complaint before it was filed.[20]  Plaintiff Loh also states that he reviewed the Motion to Certify and the Declaration he signed before they were filed.[21]  Plaintiff Loh has: reviewed documents given to counsel;[22] provided documents to counsel;[23] and met with counsel prior to his deposition.[24]  Loh communicates regularly with counsel[25] and communicates with counsel much more now that the case is in its discovery stage.[26]  Plaintiff Loh also indicated that he conducted various research before deciding to invest in Nature.[27]  Additionally, Plaintiff Loh's deposition makes clear that he understands his duties as a class representative[28] and he understands the underlying allegations.[29]

---

[18]*Id.* at 9:23-10:2.

[19]*Id.* at 9:25-10:5.

[20]*Id.* at 76:22-77:6.

[21]*Id.* at 78:12-18; 82:20-83:4.

[22]*Id.* at 10:6-9.

[23]*Id.* at 10:20-11:2.

[24]*Id.* at 11:6-17; 23:4-24:25.

[25]*Id.* at 69:19-22.

[26]*Id.* at 77:23-78:1.

[27]*Id.* at 25-41; 62:21-25; 51: 6-14.

[28]*Id.* at 84:2-25.

[29]*Id.* at 85-103.

Plaintiff Rathmann stated that he stays in contact with counsel during this litigation.[30] During this litigation, Rathmann has continued to review information concerning Nature.[31] Rathmann has read and reviewed the Complaint[32] and Consolidated Class Action Complaint.[33] Rathmann had an opportunity to review and comment on the pleadings,[34] but chose not to do so.[35]  Rathmann also reviewed the declaration that was prepared by counsel.[36]  Additionally, Rathmann understands his role as a class representative[37] and understands the nature of the claims against Defendants.[38]

Plaintiff Kader conducted some research before he invested in Nature.[39]  Kader has communicated with counsel on five to ten occasions since first becoming involved in the lawsuit[40] and met with counsel for approximately four hours to prepare for his deposition.[41]

---

[30]Docket No. 127, Exhibit D, at 6:24-7:1.

[31]*Id.* at 6-24-7:1; 21:22-22:10; 40:14-41:22; 58:14-59:5.

[32]*Id.* at 49:20-21.

[33]*Id.* at 58:14-59:5.

[34]*Id.* at 66:13-67:12

[35]*Id.* at 50:25-51:3.

[36]*Id.* at 55:2-56:2; 67:14-68:2.

[37]*Id.* at 57:11-16; 68:3-69:13; 70:23-72:7.

[38]*Id.* at 59:14-63:7; 73:2-74:7.

[39]Docket No. 127, Exhibit E, at 39:12-23.

[40]*Id.* at 21:8-24:3.

[41]*Id.* at 12:15-21.

During this litigation he has reviewed various documents[42] and has reviewed documents prepared by counsel.[43]  Kader has continued to monitor Nature during this litigation.[44]  Kader has an understanding of his duties as a class representatives.[45]  Kader also has an understanding of the underlying action.[46]

From the above, the Court finds that each of the proposed class representatives: understands their role as class representatives and the underlying basis for the Consolidated Class Action Complaint; has been in communication with counsel; has consulted with counsel concerning the litigation; has reviewed or had the opportunity to review the pleadings filed with the court; and has continued to monitor Nature.  From this, the Court finds that the proposed class representatives will adequately represent the interest of the class.

This case is distinguishable from *Shiring v. Tier Technologies, Inc.*,[47] cited by Defendants.  In *Shiring*, the proposed class representative had elected to pursue litigation only after responding to a press release distributed by the law firm involved in the case and did so only based on the law firm's investigation and research.[48]  The plaintiff there took no significant steps to supervise the action.[49]  In his deposition, the plaintiff demonstrated a lack of knowledge

---

[42]*Id*. at 24:8-23.

[43]*Id*. at 46:24.

[44]*Id*. at 52:2-53:19.

[45]*Id*. at 62:16-24.

[46]*Id*. at 60:1-24.

[47]244 F.R.D. 307 (E.D. Va. 2007).

[48]*Id*. at 316.

[49]*Id*.

8

regarding the allegations in the complaint, including not being aware of the positions of some named defendants and not being aware of the reduced class period.[50]  Additionally, the plaintiff there indicated that he primarily relied on counsel and would continue to do this to monitor and manage the litigation.[51]  Finally, there were issues with plaintiff's credibility.[52]

Here, the proposed class representatives are much more knowledgeable about the underlying action, the Defendants in this case, and their role as a class representative than the plaintiff in *Shiring*.  As noted, the Court finds that each of the proposed class representatives: understands their role as class representatives and the underlying basis for the Consolidated Class Action Complaint; has been in communication with counsel; has consulted with counsel concerning the litigation; has reviewed or had the opportunity to review the pleadings filed with the court; and has continued to monitor this case.  Additionally, there are no credibility issues here as there were in *Shiring*. Thus, the Court finds *Shiring* to be distinguishable.

It is true, as Defendants suggest, that Plaintiffs have turned some of the finer points of this litigation—such as the drafting of the complaint—over to their counsel.  However, the same can be said of all litigation, especially litigation as complex as a class action securities lawsuit.  Such a division of labor is not inappropriate.  The Court can hardly expect Plaintiffs to go forward with this case without at least some reliance on counsel.  Based on this, the Court cannot find that Plaintiffs have completely abandoned their role to counsel.  Therefore, the Court must reject Defendants' arguments on this ground.

---

[50]*Id.*

[51]*Id.*

[52]*Id.*

2.      *Language Barrier*

Defendants argue that Plaintiff Loh's language barrier poses a significant impediment to him being an adequate class representative. Loh is a native resident of Malaysia who speaks English as a second language. Loh uses English regularly as part of his job. Defendants are correct that, during his deposition, there were times when Loh had difficultly understanding questions or formulating answers to them. However, a close reading of his deposition reveals that a majority of the time, Loh understood the question being asked and responded appropriately. As noted above, Loh has a sufficient understanding of these proceedings, the underlying nature of the claims, and his role as a class representative. Therefore, Defendants have failed to provide sufficient evidence that Loh's language barrier will prevent him from being an adequate class representative.

3.      *Loh's Purchases*

Defendants argue that another factor working against Loh is the timing of his purchases of Nature's stock. Loh first purchased Nature's stock on November 23, 2005. This was after Nature filed, on November 10, 2005, an 8-K and, on November 22, 2005, an unreviewed 10-Q. In the 8-K, Nature stated:

> The Company is currently reviewing selected financial information with respect to certain of its foreign operations and, therefore, the Company's auditors have not completed their review of the Company's financial statements for the three and nine month periods ended September 20, 2005. In light of the foregoing, the Company will not be able to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2005 in the extended time period provided under Rule 12b-25 of the Securities Exchange Act of 1934. The Company believes that the financial information reported with respect to the three and nine months ended September 30, 2005 is accurate and will file its Quarterly Report on Form 10-Q for the third quarter as soon as it has concluded the reviews of selected financial information with respect to foreign operations and the auditors have completed

their review of the Company's financial statements for the three and nine month periods ended September 30, 2005.[53]

The 10-Q stated much the same thing.[54]  Loh also purchased stock on December 7, 2005, after Nature had issued a press release concerning receipt of a non-compliance letter from NASDAQ. That press release also stated that Nature believed that the unaudited consolidated financial statements contained in the 10-Q filed on November 22, 2005 were a fair representation of the Company's financial position as of September 30, 2005.  Plaintiffs contend that all of these statements were false and misleading.

It is undisputed that Loh's two purchases both took place within the proposed class period.  Defendants arguments concerning the corrective nature of the 8-K and 10-Q are unavailing.

    *4.    Kader's Purchases*

Defendants argue that Kader is inadequate because, during the proposed class period, he made a number of profitable transactions.  But Defendants concede, as they must, that Kader suffered a net loss of $2,000.

This is not an adequacy issue, so much as it is a damages issue.  It is undisputed that Kader purchased during the proposed class period and that he suffered a loss.  The fact that his previous successful transactions offset his total loss amount does not make him an inadequate class representative,[55] but it may serve to reduce his damages, if any.

---

[53]Docket No. 85, ¶ 54.

[54]*Id*. ¶ 62.

[55]*See, e.g., In re Bally Mfg. Sec. Litig.*, 141 F.R.D. 262, 270 (N.D. Ill. 1992) ("[T]hose who sell stock before the close of the class period are suitable class members (and representatives) because they have still suffered injury—they may simply have been less

    5.    *Rathmann's Amount of Loss*

Defendants' final argument is that Rathmann is not an adequate class representative

because he only had a single transaction in Nature's stock, which resulted in a loss of

approximately $1,000.  The Court joins with other courts and "rejects defendants' suggestion that

the relatively insubstantial value of plaintiff's claim may present him from adequately

representing the class."[56]

From the above, the Court finds that Plaintiffs are adequate class representatives and they

have met all of the requirements of Rule 23(a).

B.    RULE 23(b) REQUIREMENTS

In addition to the prerequisites above, Rule 23 also requires the Court to find that

Plaintiff's claim is maintainable as a class action under one of the three categories of suits

described in Rule 23(b).  Plaintiffs argue that here the requirements of Rule 23(b)(3) are met.

Rule 23(b)(3) requires the Court to find: (1) that "questions of law or fact common to

class members predominate over any question affecting only individual members" and (2) "a

class action is superior to other available methods for fairly and efficiently adjudicating the

controversy."[57]  Rule 23(b)(3) provides a non-exhaustive list of factors the Court is to consider in

making this determination.[58]  The only issue here is whether common questions predominate.

---

injured.") (quotation marks and citation omitted); *In re AM Int'l, Inc., Sec. Litig.*, 108 F.R.D. 190
(S.D.N.Y. 1985) ("[T]he mere fact that a plaintiff sold stock during the class period does not in
itself disqualify him from acting as class representative.").

[56]*Lewis v. Capital Mortgage Invs.*, 78 F.R.D. 295, 303 (D. Md. 1977).

[57]Fed.R.Civ.P. 23(b)(3).

[58]*Id.*

To determine whether common questions predominate, the Court turns to the underlying action.  The basic element of an action under Section 10(b) and Rule 10b-5 thereunder include: (1) a material representation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.[59]  At issue here are elements four and six: reliance and loss causation.

### 1.    Reliance

The Supreme Court's decision in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), obviates the necessity that a plaintiff prove reliance and, instead, permits the rebuttable presumption that a plaintiff relied on the integrity of the market price in purchasing his or her shares of stock.  The presumption is appropriate only if the company's stock was traded in an "efficient market."  Commonly referred to as "the fraud-on-the-market theory," this approach assumes that in an efficient market, all the available information about the company is quickly reflected in the price at which people are willing to buy and sell the stock.  Thus, the theory continues, "[i]nvestors rely on the price of the security as an accurate reflection of its worth.  They, therefore rely indirectly on such misrepresentations, even if they do not rely on them directly."  Consequently, "[t]he fraud on the market theory cannot be applied logically to securities that are not traded in efficient markets."  Here, the determinative question now becomes whether [Nature] stock traded in an efficient market, thereby allowing Plaintiffs the benefit of the presumption.[60]

Courts look to a number of factors, commonly known as the *Cammer* factors, to determine whether securities are traded in an efficient market.[61]  These factors include: (1) average trade volume; (2) number of securities analysts following the stock; (3) number of market makers; (4) whether the company was entitled to file an S-3 Registration Statement; and

---

[59]*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).

[60]*Serfaty v. Int'l Automated Sys, Inc.*, 180 F.R.D. 418, 421 (D. Utah 1998) (quoting *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197, 198 (6th Cir. 1990)).

[61]*See Cammer v. Bloom*, 711 F.Supp. 1264, 1285–87 (D. N.J. 1989).

(5) evidence of a cause and effect relationship between unexpected news and stock-price changes.[62]

In support of their contention that they have met the *Cammer* factors, Plaintiffs have submitted the Declaration of Scott D. Hakala, Ph.D., CFA, Regarding Market Efficiency and Loss Calculation.  Defendants have not submitted a declaration from an expert of their own and do not dispute four of the five *Cammer* factors.  The Court will consider each of the factors in turn.

        *a.*     *Average Trade Volume*

The first factor concerns whether "there existed an average weekly trading volume during the class period in excess of a certain number of shares."[63]  The Court in *Cammer* noted the importance of this factor as follows:

> The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.[64]

In *Cammer*, the court found that turnover measured by an average weekly trading of two percent or more of outstanding shares would justify a strong presumption of an efficient market, while one percent would justify a substantial presumption.[65]  Here, the average weekly trading volume for Nature's stock was about 2.7% of the outstanding shares during the proposed Class

---

[62]*Id.  See also Serfaty*, 180 F.R.D. at 421–23 (examining *Cammer* factors); *Arena Land & Inv. Co., Inc. v. Petty*, 906 F.Supp. 1470, 1480–81 (D. Utah 1994) (same).

[63]*Cammer*, 711 F.Supp. at 1286.

[64]*Id.*

[65]*Id.*

Period,[66] above the two percent noted by the *Cammer* court.  Thus, this factor weighs in favor of a finding of market efficiency.

### b. Number of Securities Analysts Following the Stock

Second, the *Cammer* court noted that "it would be persuasive to allege a significant number of securities analysts followed an reported on a company's stock during the class period."[67]  The reasoning behind this is that "[t]he existence of such analysts would imply, for example, the [company] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.  In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [company] reports, as interpreted by the securities analysts."[68]

Dr. Hakala's Declaration states that "Nature's Sunshine was actively covered by a number of brokerage firms and other analysts."[69]  Dr. Hakala identifies four different securities analysts who published reports on Nature during the class period.[70]  These "analysts provided regular coverage on Nature's Sunshine and commented on its quarterly financial results on a consistent basis throughout the Class Period."[71]

---

[66]Docket No. 118, ¶ 7.

[67]*Cammer*, 711 F.Supp. at 1286.

[68]*Id.*

[69]Docket No. 118, ¶ 10.

[70]*Id.*

[71]*Id.*

Courts have found that the existence of two analysts does not heavily favor a finding of efficiency.[72]  But courts have, in the context of class certification, applied the fraud on the market theory where at least six securities analysts issued reports on the stock during the class period.[73]  Here, there were four analysts who published reports during the class period.  While this factor does not heavily favor a finding of efficiency, it, at least somewhat, weigh in favor of a finding of market efficiency.

c.    *Number of Market Makers*

"For NASDAQ stocks, a market maker is merely a brokerage house that announces itself ready to buy or sell a specified number of shares at specified prices."[74]  "The existence of market makers and arbitrageurs . . . ensure[s] completion of the market mechanism; these individuals . . . act swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[75]

The Hakala Declaration does not identify the number of market makers here.  However, Dr. Hakala does state:

> The total number of outstanding shares ranged from in excess of 15.2 million throughout most of the Class Period.  Of the shares outstanding, the shares not held by officers or directors were consistently in excess of 11 million.  Shares held by non-affiliates had a trading value of approximately $227.9 million as of November 18, 2005.  The trading value of shares held by non-affiliates (the public float) was consistently in excess of $200 million during the Class Period.  From my experience when advising clients with respect to IPOs and other common stock registration, as a general rule, a public float of at least 2 million shares with

---

[72]*See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003).

[73]*See In re Amerifirst Securities Litigation*, 139 F.R.D. 423, 431 (S.D. Fla. 1991).

[74]*O'Neil v. Appel*, 165 F.R.D. 479, 501 (W.D. Mich. 1996).

[75]*Cammer*, 711 F.Supp. at 1286–87.

> a total market value of the float in excess of $20 million is considered sufficient to attract adequate market-maker and institutional interest and a market value of the float in excess of $50 million will attract full interest on the part of brokerage firms and market makers.[76]

Defendants do not dispute or rebut this conclusion.  From this, the Court can infer that there were a sufficient number of market makers.  Therefore, this factor weighs in favor of finding market efficiency.

> ### d.      S-3 Registration Statement

"Whether or not a company is eligible to file a S-3 Registration Form is also helpful in determining whether class certification should proceed on a presumption of reliance."[77] "Eligibility to complete a S-3 Form is helpful because the SEC permits registration 'only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.'"[78]

Nature was eligible to file an S-3 Registration Form.  Thus, this factor weighs in support of finding market efficiency.

---

[76]Docket No. 118, ¶ 6.

[77]*Cheney*, 213 F.R.D. at 500 (citing *Cammer*, 711 F.Supp. at 1287).

[78]*Id*. (quoting *O'Neil*, 165 F.R.D. at 502).

e.    *Reaction to New Information*

The final *Cammer* factor is, perhaps, the most important.[79]  "If a plaintiff can empirically demonstrate that stock prices regularly rose or fell in prompt response to market information, this fact would be significant in establishing an efficient market."[80]

Dr. Hakala has preformed an event study, "[i]n order to assess the reaction of Nature's Sunshine share price to relevant news events."[81]  As part of his event study analysis, Dr. Hakala identified 93 material events, which were days when potentially material information came into the market.[82]  Dr. Hakala found that the events "explained a significant portion of the remaining unexplained variance in Nature's Sunshine share price throughout the study period."[83]  Dr. Hakala found that "the share price of Nature's Sunshine reacted more and was significantly more likely to change in relative terms on identified event days, than on non-event days.  Furthermore, the reactions to the latest material news tended to be swift and fully absorbed within one full day of trading in the absence of additional news."[84]  These findings support his conclusion that there

---

[79]*See In re 2TheMart.com, Inc. Sec. Litig.*, 114 F.Supp. 2d 955, 964 (C.D. Cal. 2000) (quoting *Cammer*, 711 F.Supp. at 1287) ("[T]he fifth factor may be the most significant factor in determining market efficiency as it is 'the essence of an efficient market and the foundation for the fraud on the market theory.'").

[80]*O'Neil*, 165 F.R.D. at 502–503 (citing *Cammer*, 711 F.Supp. at 1287).

[81]Docket No. 118, ¶ 11.

[82]*Id*. ¶ 12.

[83]*Id*. ¶ 16.

[84]*Id*.

was "a 'cause and effect relationship' between unexpected corporate events and financial releases and movements in the security price."[85]

As noted, Defendants have not submitted a declaration from an expert of their own. Rather, Defendants challenge the findings and conclusions of Dr. Hakala. Defendants argue that, of the 93 event days chosen by Dr. Hakala, only 23 of those days (or less than 25%) result in a statistically significant change to Nature's stock price.[86] Defendants argue that in an efficient market material news should result in a statistically significant change in Nature's stock price. Thus, Defendants argue that the market was not efficient. The Court finds that Defendants have not met their burden to rebut the findings and conclusions of Dr. Hakala. Defendants could have, and should have, provided an expert opinion of their own if they sought to challenge Dr. Hakala's conclusions. Having failed to do so, the Court is left with Dr. Hakala's declaration as the only evidence on the issue.

In examining the event study prepared by Dr. Hakala,[87] it is clear that Nature's stock prices regularly rose or fell in prompt response to market information. Nature's stock price rose based on certain positive events and fell based on negative events. For example, on July 21, 2004, stock price rose 6.55% after reporting strongly improved operating results for the 3 and 6 months ended June 30, 2004;[88] when Nature's stock was downgraded to a "buy" from a "strong

---

[85]*Id*. ¶ 5(e).

[86]Dr. Hakala identified an event as statistically significant if the event had a t-statistic of 1.65 or greater. *Id*. at ¶ 15.

[87]As Defendants have submitted no evidence of their own concerning this element, the Court is left to consider the event study prepared by Dr. Hakala.

[88]*Id*., Exhibit D, at 2.

buy" by analyst Ivan Feinseth at Matrix USA, Nature's stock fell 5.35%;[89] Nature's stock rose

11.78% after being rated a "strong buy" by analyst David Black at Seidler Co.;[90] on February 17,

2006, after announcing a projected fourth quarter loss of $5,200,000, Nature's stock declined

5.62%;[91] after announcing that an audit committee found "material weaknesses" and potential

legal violations in the company's accounting, Nature's stock fell 13.17%;[92] after announcing that

it may be delisted from the NASDAQ Stock Market because it did not file an annual financial

report on time, Nature's stock fell 14.44% on March 24, 2006, and another 6.11% on March 27,

2006;[93] when Nature was named in a class action suit, it shares fell 17.10%;[94] and when Nature

was delisted from the NASDAQ on April 5, 2006, Nature's stock fell another 15.44%.[95]  From

this, Plaintiffs have made a sufficient showing of a cause and effect relationship between new

and unexpected information and Nature's stock price.  Thus, this factor supports a finding of

market efficiency.

From the above, the Court concludes that, for the purposes of class certification, Plaintiffs

have shown an efficient market such that reliance on the fraud on the market theory is

appropriate.  Thus, reliance is presumed for the purpose of class certification.

---

[89]*Id*. at 5.

[90]*Id*. at 6.

[91]*Id*. at 9.

[92]*Id*.

[93]*Id*. at 10.

[94]*Id*.

[95]*Id*.

2.      *Loss Causation*

Next, Defendants argue that loss causation must be established at the class certification stage.  In support of this contention, Defendants rely on the Fifth Circuit case of *Oscar Private Equity Investments v. Allegiance Telecom,Inc.*[96]  In that case, the court held "that loss causation must be established at the class certification stage by a preponderance of all admissible evidence."[97]  This holding was derived from the Fifth Circuit's previous rulings that: (1) loss causation is a fraud on the market prerequisite; and (2) a complete analysis of fraud on the market indicators at the class certification stage is required.[98]

The dissent in *Oscar*, described the majority decision as "a breathtaking revision of securities class action procedure that eviscerates *Basic*'s fraud-on-the-market presumption, creat[ing] a split from other circuits by requiring mini-trials on the merits of cases at the class certification stage, and effectively overrul[ing] legitimately binding circuit precedents."[99]  Other courts have refused to follow *Oscar* for those same reasons.  The District of Idaho, in rejecting *Oscar*, stated that "*Oscar* has not been considered or adopted by the Ninth Circuit.  It is unlikely that it would be adopted in this Circuit because it misreads *Basic*."[100]  The Southern District of New York also rejected *Oscar*, noting that courts within the Second Circuit have certified classes

---

[96]487 F.3d 261 (5th Cir. 2007).

[97]*Id.* at 269.

[98]*Id.* at 268–69.

[99]*Id.* at 272 (Dennis, J. dissenting).

[100]*In re Micron Technologies, Inc. Sec. Litig.*, 247 F.R.D. 627, 634 (D. Idaho 2007).

despite the lack of evidence of loss causation.[101]  Another decision from the Southern District of New York recently noted that the standard set out in *Oscar* "is limited to the Fifth Circuit."[102]

Defendants have not pointed to, and the Court cannot find, any case within the Tenth Circuit which has adopted the Fifth Circuit's position requiring proof of loss causation at the class certification stage.  Indeed, "[n]o other Court of Appeals, and no other district court outside the Fifth Circuit, appears to have followed *Oscar*."[103]  As noted by Plaintiffs, the Fifth Circuit's decision in *Oscar* appears to be in conflict with Supreme Court and Tenth Circuit precedent which warn against determining the merits at the class certification stage.[104]  For those reasons, the Court declines to adopt *Oscar* and will not require a showing of loss causation at the class certification stage.

Based on the above, the Court finds that the requirements of Rule 23(b) have been met in this case and that class certification is appropriate.

## C.   DEFERRAL OF CLASS CERTIFICATION

Defendants argue, in the alternative, that the Court should defer ruling on class certification until the company's new auditor has completed a re-audit.  Defendants argue that the

---

[101]*Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112 (S.D.N.Y. 2008).

[102]*Darquea v. Jarden Corp.*, 2008 WL 622811, *4 (S.D.N.Y. Mar. 6, 2008).

[103]*Ross v. Abercrombie & Fitch Co.*, 2008 WL 4059873, *3 (S.D. Ohio Aug. 26, 2008).

[104]*See, e.g., Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974) (stating that "[w]e find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988) ("[I]n making the class certification determination . . . the district court should avoid focusing on the merits underlying the class claim."); *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982) ("If the denial of class certification was influenced by the court's preliminary evaluation of the merits of [plaintiff's] claim, the court committed error.").

re-audit will allow Nature and its new auditor to conclude whether Nature's 2004 financials need to be restated and, if so, in what areas and in what amounts. Defendants argue that this will impact this litigation in a number of ways. First, it will constitute the "corrective disclosure" needed for the analysis of loss causation. Second, it will focus the analysis of the scienter element. Both of these issues, however, are issues going to the merits, not class certification. Thus, there is no reason to defer class certification.

D.      CLASS BEGINNING AND ENDING DATES

Defendants argue that there are defects in both the beginning and ending dates of the proposed class period.

As noted, Plaintiffs propose two different class periods: (1) March 16, 2005, to April 5, 2006, relating to their claims pursuant to Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 thereunder (the "affirmative misstatements claim"); and (2) March 15, 2005, to April 5, 2006, relating to their claims pursuant to Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5(a) and (c) thereunder (the "scheme claim"). March 16, 2005, is the date that Nature filed its 2004 10-K and March 15, 2005, is the date on which Defendant Faggioli allegedly gave KPMG, Nature's prior auditor, a false management representation letter that caused KPMG to issue a clean audit option that was then included in the 10-K.

Defendants arguments with regard to Plaintiff's scheme claim have been addressed by separate order and that claim has been dismissed.[105]   Therefore, the Court will not certify a class on that claim.

_____

[105]*See* Docket No. 192.

Defendants further argue that the proposed April 5, 2006, ending date is inappropriate. Defendants argue that the appropriate date is March 20, 2006, when Nature filed an 8-K warning investors not to rely on any of its financials.  The March 20, 2006 8-K stated, in pertinent part, that the financial statements filed with Nature's 10-Qs for the first three fiscal quarters of 2002 through 2005 and its 10K for the fiscal year ended December 31, 2004 should not be relied upon.[106]

Plaintiffs argue that the March 20, 2006 8-K was only a partial corrective disclosure and that further corrective disclosures were revealed after March 20, 2006, which made Nature's stock price continue to fall.  In particular, on March 24, 2006, Nature issued a press release stating that its securities would be delisted from trading on NASDAQ.[107]  On March 27, 2006, Nature filed an 8-K reiterating the statements made in the March 24, 2006 press release.[108]  On April 3, 2006, Nature filed an 8-K which attached two letters from KPMG, which disclosed additional adverse information.[109]  As a result of this information, Nature's price dropped an additional $3.54 per share of 29.4% over the next two days in heavy trading.[110]

"In order for a court to shorten a proposed class period at the certification stage in a securities case involving fraud on the market, the court must be able to rule, as a matter of law, that a curative disclosure had been made so as to render it unreasonable for an investor, or the

---

[106]Docket No. 85, ¶ 81.

[107]*Id*. ¶ 142.

[108]*Id*. ¶ 143.

[109]*Id*. ¶ 145.

[110]*Id*. ¶ 146.

market, to continue to be mislead by the defendants' alleged misrepresentations."[111]   The Court finds, as a matter of law, that it was unreasonable for an investor, or the market, to rely on Nature's financial statements after March 20, 2006.  Nature made clear that those statements should no longer be relied upon.  Thus, the Court finds that the appropriate class ending date is March 20, 2006.

## III.  CONCLUSION AND ORDER

It is therefore

ORDERED Plaintiff's Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel (Docket No. 115) is GRANTED IN PART. It is further ORDERED that the class of plaintiffs is defined as follows:

- all persons who purchased or otherwise acquired the common stock of Nature from March 16, 2005 through March 20, 2006 and were damaged thereby, pertaining to the alleged violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 thereunder;

- Excluded from the Class should be defendants, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director, or other individual entity in which any defendant has a controlling interest or that is related to or affiliated with any of the defendants, and the legal representative, agents, affiliates heirs, successors-in-interest or assigns of any excluded party.

---

[111]*In re Resource Am. Sec. Litig.*, 202 F.R.D. 177, 183 (E.D. Pa. 2001).

It is further

ORDERED that Lead Plaintiff Loh Chee Kuang and named Plaintiffs Rick Kader and Peter Rathmann are appointed as the representatives of the class.  It is further

ORDERED that the Rosen Law Firm, P.A. is appointed as lead class counsel and Hatch, James & Dodge is appointed as liaison class counsel for all purposes in this action.  It is further

ORDERED that the parties shall meet and confer on the form and manner of providing notice, and within sixty (60) days of this order, submit their proposal for notice to the Class to the Court for approval.

DATED   September 25, 2008.

BY THE COURT:

_____
TED STEWART
United States District Judge